The next case scheduled for argument this morning is number 21-853, Gamma Traders vs. Merrill Lynch and others. Everyone settled? Please proceed. May it please the court. My name is Eric Citron. I represent the plaintiffs in this matter. Mr. Citron, could you adjust the microphone so it's closer to your... I might have to lean in. All right. That would be helpful. Thank you. I'm told I'm supposed to do that. My name is Eric Citron. I represent the plaintiffs in this matter. Unless the court prefers otherwise, I'd like to start by discussing the district court statute of limitations holding, which I think is both procedurally and substantively incorrect. Actually, I think the procedural error is the most straightforward way in which to resolve this appeal. The court's made clear that a statute of limitations defense should only be resolved against a plaintiff on a motion to dismiss if the complaint itself reveals that the claim is out of time. That's what happened in Levy where the complainant fled herself out of court by saying there was no explanation for her loss apart from a violation of the CEA. And you can see this rule, a very strong application of this rule, in the court's decision in BPP Illinois against Royal Bank of Scotland, which the court then cites for the same proposition in Schwab, and in cases like Harris against City of New York. They all say that this information has to come from the complaint itself. But it's not always an error, is it, to look to matters of public record for the fact that they were in the public discourse at the time in assessing the validity of the statute of limitations affirmative defense, is it? There may be circumstances in which they don't go to disputed factual questions, that there's essentially no dispute about who had read what or who would be aware of what. I think the critical point is that what we have here is a dispute about classic factual questions. What would an ordinary investor have been aware of at the time? What would a reasonable investigation have looked like? What would a reasonable investigation have revealed? Who had, in fact, read what? And all of that, it's just one step premature. Of course, the defendants are entitled to make these arguments on summary judgment or at trial, and we would refute them. But we're having a fight about a bunch of materials. Many of them don't even appear in the record. But some of these are public filings of court documents, and your view is that that alone is not sufficient? You'd have to have a factual hearing to determine whether or not it was reasonable for someone to be aware of what's filed in courts around the country? Really? I guess I don't think it's that weird to question whether a reasonable investor would have read this 269th paragraph. Well, I don't think the issue is whether it's weird. The issue is whether or not courts have acknowledged those kinds of public filings as putting one on inquiry notice. Your view is that it's a case-specific inquiry every time, and we have to figure out the education level of the plaintiffs? We have to figure out what their subscriptions are, what they read? I mean, I think it's what would a reasonable investor have reviewed and been aware of. There's certainly no legal rule that a reasonable investor would be aware of everything that appears in a federal court document, and you can't apply a rule like that to decide the case. Of course, I think the decision is also flawed on the substance. You can grant that they ought to have been aware of what appears in the silver complaints, and I think we should still prevail. And the best way to substantiate that is just to look at what Judge Caproni herself decided in the silver case about the allegations that were made there. She makes two holdings that I think are critical for our present purposes. One of them is that those plaintiffs had not plausibly pled their own injury from episodic manipulation. So if those allegations are insufficient even to make it plausible that the plaintiffs were injured, they certainly don't demonstrate the probability of injury to our plaintiffs. And of course, that's just about silver as well, I mean, because we're talking about a platinum-palladium market as well as gold here, and as to each of those, there are different chronologies. Isn't that correct? There are different chronologies, but there's even less material as applied to gold and platinum and palladium than there is silver. There's literally an offhand mention in one paragraph in each of the complaints that says, these folks were manipulating the platinum and palladium fix or the gold fix through a bunch of tactics, one of which, quote, included spoofing. That's it, as applied to the two others. So I think if you don't think there's sufficient material to establish plausible injury in silver, you're going to think a fortiori the same thing with respect to gold. Of course, that was earlier. Silver was earlier. Earlier in time. Wasn't it earlier in time? I think it may be, too. Yeah, yeah. Which I think is further to the same point, right, if it's earlier in time than the later one. Well, gold, you've got newspaper articles talking about the commonplace nature of spoofing in the gold markets, and that's in 2015, right? Well, so then they don't say spoofing. They're talking about a different scheme. And they say, you know, if you look at the articles that are in the back of our reply brief, I should say we put them there because they're paywalled. That's why there can be reasonable disputes about who saw what. But those, they don't mention spoofing. And the scheme that they're talking about was one big instance of manipulation of a barrier option. And the FCA, the British regulator, says this appears to be a one-off, right? And what Judge Caproni says is that what was critically missing from the allegations in that complaint was an allegation about the frequency of the episodic manipulation. And that's, of course, what is revealed by the governance complaint in 2018, which is our story. We say that complaint is what started the clock and that we are within the statute of limitations with respect to that complaint. And this is— So why wasn't it enough still to just trigger a duty to inquire about spoofing? If your clients had been trading in these markets and there were general press reports about the spoofing among other fraudulent activities in those markets, why isn't that enough to trigger a duty to inquire? Well, the standard is aware of the probability of injury. And as I said, what Judge Caproni explicitly decides is that there wasn't even sufficient information to demonstrate the plausibility of injury. So probability being the higher standard, it's just not there. And frankly, it's not—it's as expected that the standard would be relatively high to trigger this duty to investigate, in part because we're going to hold you to that duty even if an investigation was not going to reveal anything and would have been unreasonable to undertake. And so what we want—you know, the Supreme Court says in Gabelli we don't want people wandering around constantly looking for evidence that they were defrauded. The government has that obligation, but individual plaintiffs do not. What triggers them to get involved is not the indication that maybe they were injured, but some indication that they should seriously believe that they were injured. And so it is knowledge of the probability of injury that triggers that duty to investigate. I do think some confusion arises in the cases from the fact that it's knowledge of the injury that triggers the duty to investigate. But you then have to investigate the other elements of the claim, which you may not have any reason to know at the time. So, you know, in a classic medical malpractice situation, you know that you're injured before you know who the surgeon was sometimes, that negligence was the cause of the injury, and the like. Here, we could have been aware—or someone might be aware of the injury before they know which defendant to sue. At that point, you absolutely do have the duty to inquire, right? Could you address—the Silver Court, Judge Caproni found that even after the January 2018 DOJ criminal complaint, that the plaintiffs there had not plausibly alleged a Commodities Exchange Act injury related to spoofing. I read the opinion. And I wonder why we should reach a different result here if we were to agree with you that your claims are timely. Absolutely. I think because our complaint is different from the complaint that was at issue in Silver, most importantly on the exact issue that Judge Caproni pointed to, she said they did not plausibly allege, quote, that they, quote, made no factual allegations of the frequency of episodic manipulation or the predicted impact of episodic manipulation on silver prices. And that's—we did the opposite. We made clear that they did thousands of instances of manipulation, that we transacted thousands of times in the same contract, in the same market, over a bout of defendant's manipulation, which is exactly what total gas calls for, and then went on to identify the 14 out of 30 specific instances where we're trading the same contract in the opposite direction on the same debt. But doesn't it matter whether the spoofing happened before you traded or not? I think it could matter, although— Why wouldn't it? So if the spoofing took place after your contracts, why would spoofing have affected the price that your client paid? Well, there's spoofing throughout the period, and it is a dispute between us and them how long that manipulation— Well, where in the complaint is that dispute? I mean, where in the complaint does it say how long the effects of spoofing are felt? Well, what we say—this is on paragraph 46 of the complaint, which is at JA69. We say the defendant's manipulation of the markets for precious metals caused prices to be artificial throughout the class period. So our view is that the defendants have altered the price away from— But there's no explanation as to why that would be the case. Your view is just sort of saying that.  Well, I mean, I don't think a million years. I do think saying throughout the class period they are engaged in manipulation and we are trading in the same market and we are likely to be injured by the distortions that occur throughout the class period is plausible enough for a complaint at the outset. I should say also, we do have— What is the theory on which these spoofs would have a long-lasting impact? I understand that I don't understand this market, but from what I understand of the various allegations, it sounds like the whole point of the spoof is to make a kind of quick hit. So I'm glad you asked that because I think this is very important. The point of the spoof is to make a quick hit and the defendants are right that the spoof bid itself is going to come down after the transaction is consummated. But that transaction is consummated at a manipulated price and that actual transaction comes to the board. Yes, but just so we're clear, that gets you back to Judge Sullivan's question of if you traded on the same day before that spoof happened or possibly even if you traded several hours later, why shouldn't the market return? Because somebody made this strange bid and then all the transactions that transpire after that take place at lower prices. Why should we assume that that quick hit that happened has a long-lasting effect that's pervasive or even that a lot of little spoofs over a long period of time are not just blips that don't have any real market impact? What I'm saying is the actual transaction which posts to the board at a manipulated price is then going to affect market behavior because that's not just a bid. People see that that transaction closed at a price that by hypothesis is lower or higher than it should have been and that could affect market trends, what people do in response and the like. Again, we have a classic factual dispute about how long that kind of effect will last. Am I right that you're saying also that some of the relevant information about the effect on the market is in the hands of the defendants and is not available to you and required the government years to develop a model that described accurately some of the distortions of the market that were the effect? That's exactly right, and I'm glad that you returned me to that because I did get distracted. We even point out in the complaint that because this is all concealed behavior that we expect discovery to turn up a lot of this information. This is exactly the kind of complaint where you would expect to take this kind of tack. You would say it's plausible that we were injured in at least one transaction, so we're an appropriate plaintiff to initiate this litigation, but we're going to need discovery to uncover all the details. That's what we did. That's at paragraph 6 of the complaint. Judge Sullivan, I do want to make sure I get back to your question, although I realize I'm way over my time. Please go ahead and take the time. I am not suggesting that causation runs backwards in time. I'm sorry, could you say that again? I couldn't understand. I'm not suggesting that causation runs backwards in time. If we were talking about one transaction of ours and one transaction of theirs, there's no way I'd be telling you that it's not relevant whether our transaction was after they were spoofing. No, but it seems what you're arguing is that there are so many trades and this was so rampant that it must have had an effect. That really seems to be what you're arguing. Is that a fair statement? Yes, or just to state it very clearly, that it is plausible to believe that it had an effect on at least one of our thousands of transactions, recognizing that Twombly explicitly says that plausibility includes things that are, quote, very remote and unlikely or improbable. But doesn't that really, getting back to what Judge Lynch said before, doesn't that really require you then to articulate a theory as to how long spoofing affects the market? And haven't you failed to do that? Well, we've made an allegation about that. And then I think the question about how long it affects the market requires a lot of factual development. We're going to want to retain an expert to try to model out how long the effects were lasting. And it's based in part on what the defendants were doing, which we don't yet know. All we know is that they were doing it thousands of times. If they did it 100 times on the same calendar day, which is possible, the effect might be much larger and longer last. If not, not. I don't have the facts, so I can't tell you what those look like. Is this a little bit like antitrust colluding behavior, for example, that affects the prices over time of a commodity that is difficult to pin down as to particular points, but it becomes artificial over a period? I think that that's a good analogy in the following respect. It's going to be very hard to tell you exactly how long or how far the effect on the prices is going to be, in part because of the complex nature of the defendant's fraud and the fact that we're talking about a counterfactual and history does not reveal her alternatives. There's a lot of facts to be developed. All we're trying to do at this very initial stage is to show that it is plausible that we are injured in one transaction, and that has to be a low enough bar to allow us to get the information from the defendants so that we can model it out. And look, this is a situation in Twombly. The question was the plausibility of the conspiracy. We know that the defendants were doing the bad stuff. The question is, was it affecting us or not? And we've plausibly pled that it affected us because we're trading thousands of times, they're spoofing thousands of times, and based on the 30 random instances detailed in the government's complaint, we happen to be trading opposite them on 14 of them. I think that's a pretty good indication that if you were a betting person, you wouldn't bet against the possibility that we were injured on at least one of our transactions by their spoofing. All right, thank you, Mr. Citron. You'll have several minutes of rebuttal. We'll hear from the defendants. You can raise the podium if you'd like. Right, there's a button on the right. Here you go. Thank you. May it please the court, Richard Schwade of Sherman Sterling. We represent the Bank of America and Merrill Lynch defendants, but we'll be presenting on behalf of all of the defendants today. We respectfully submit that the district court properly dismissed this case on two equally good and independent grounds. Equally good? If you had to pick one, which one would you pick? Honestly, I think they're both unassailable. Which one is more unassailable? I think the statute of limitations in some sense is more straightforward. I'm not sure it's better, but it is more straightforward in the sense that this is a unique case. It's a simple application, we think, of the Commodity Exchange Act, statute of limitations, and inquiry notice, but it's a unique case because of the massive amount of information that was available. Second question is, do you think that we need to do a market-by-market analysis? Is your view that what's true for silver can be imputed to gold, platinum, and palladium? I do not. We are not taking the position that if the only thing they had related to silver that necessarily would implicate gold, platinum, and palladium. Our view is that the silver complaint combined with the gold complaint, the platinum and palladium complaint, and all the numerous articles that we cite, you put that all together because you have to look at the entirety of the information that was available in the public record. If you look at that, that together clearly put the plaintiffs on inquiry notice. There were store warnings for gold, silver, platinum, and palladium. I have trouble with the district court's opinion in that on the one hand, the district court found that the plaintiffs should have known that they were probably injured by spoofing in the markets, and on the other hand, it found that they did not plausibly plead that they were injured by spoofing in the market, which seems to me potentially backwards. Is that a pleading failure? Isn't that inconsistent? I frankly do not think it is inconsistent. And the reason is one way to think about it is if you just sort of go to the basic fundamentals of notice and pleading, it really would turn Twombly on its head to say it takes more to hail somebody, it takes less to hail somebody into court and say I was injured by them and state a claim than it does to be required to investigate whether you were injured. But we use the word probable in one circumstance and plausible in the other. Isn't probable more demanding than plausible? Most of the cases use the word a probability, which does not have, and I don't think the court's intended to mean a mathematical number because after the fact So you disagree that probable is a higher standard than plausible? I think that if you take the words in You disagree? Do I disagree? I disagree that the standard for pleading a claim is lower than the standard for being on inquiry notice. And if I could give a simple example. Please do. If you got very clear evidence that you are a partner in a partnership and there were five partners, and that somebody robbed or somebody defrauded one of the five partners, but they don't tell you who it was, I would respectfully submit that you have a duty to inquire, to do some level of investigation to figure out if you were one of the five. On the other hand, I don't think you could run into court and say I was injured. I was defrauded. Why? Because, well, somebody was and maybe it was me. And so if you think of that kind of scenario, it makes perfect sense when you're on notice of an actual wrongdoing. And a lot of the cases, why they get caught up in the word probability is there's no information about an actual wrongdoing. The only thing you might know is whether you were injured. But where you are on actual notice of a very clear wrongdoing, and you are one of the group of people who may have been injured by that wrongdoing, you have a duty to inquire whether you were or were not part of that group. So can I just, Mr. Schwade, put it another way? What you're saying is that it's not a question of whether probability is a stronger, higher standard than plausibility, but the plausibility standard applies to a whole series of elements of a cause of action, while whatever the standard is, a probability, more likely than not, however we could argue about that, whatever the standard is, that applies just to whether you were injured. I think that's a fair way to put it. If I have an operation and I come out of it worse than I went into it, I may be on inquiry notice already to look into whether there is malpractice. But in order to plead malpractice, I have to allege more than that I went into the operation better off than I came out of it. Right. I think you always have to plead more than you need to start investigating, and that makes sense. You're supposed to investigate to try to establish enough to make a claim. If you actually have enough to make a claim, then you're on actual notice. And that's why there would be no concept of inquiry notice if you required enough to state a claim to be on actual notice. You may well be right about that, but one of the things that gave me a problem with the statute of limitations analysis is that what seems to be the main thrust of everything that you cite, there are references to, and there's this thing called spoofing, but most of what's out there is sort of, there's a lot of bad stuff happening in these markets, including things that sounded to me more like the LIBOR situation where people are colluding to affect the benchmarks and so on. And I was wondering, isn't this just like saying, well, you're in the stock market, and look at all the cases there are showing that people commit frauds in the stock market, and now your stock dropped in value suddenly. You're automatically on inquiry notice because those markets are corrupt. How is your case distinguishable from that? I think that if you look at the record before the silver complaint, the silver proposed third amended complaint was filed, and after the silver complaint was filed answers that question. Before the silver complaint was filed, that case was primarily about the London silver fix, which is a benchmark, and it was primarily about benchmark, the defendants manipulating the benchmark. The proposed third amended complaint added a bunch of new defendants, including my client, and the reason those new defendants, none of the new defendants were part of the fixing panel or the fixing group. They were added because there were separate and additional claims that they uncovered about spoofing and other manipulative devices. They tried to connect the two, but they also independently said, look, they're spoofing on a regular basis, and so I, in my mind, that's why we focused on that date. That, to me, tipped the scale. Before that date, the allegations were not nearly as clear, but by that date there were chats in that, there were chats from my client's employees in that complaint that clearly, and the theory of the case, and that's the way it was briefed, and that's the way Judge Caproni analyzed it, was separate claims having to do with fixing and separate claims having to do with spoofing, and then when you take that spoofing conduct, that puts you on inquiry notice, and I think that also sheds some light on the references to spoofing and gold. It sheds some light on the references to spoofing and platinum and palladium. There are references in some of the chats to palladium and gold, which tells you, hey, these same traders were trading those other metals. They're accused of spoofing here. Let's look there when you combine all the information, the articles, et cetera. But still, you claim here that plaintiffs haven't pled enough to show actual injury. You say both as to the thousands of transactions and as to the specific trades, that that isn't still enough to show that they were actually harmed financially by any spoofing that has been admitted so far. It seems to me that that's kind of contrary to the sense that they had inquiry notice, that they had enough to go forward. None of these details came to light until the criminal complaint was filed. And even that, you say, is not sufficient. Yeah, and I think the reason it's not sufficient in part is because plaintiffs have not done the investigation that one would expect them to do to try to prove up their claim or to try to plead their claim. Well, part of what they say the answer is that not all of the transaction records or particularly the spoof records as to transactions that were proposed and then canceled, those are not publicly available. Do you disagree that they believe that they had access to everything they needed to? I think they had access to enough. And one of the things that the district court oral argument transcript reveals is that what they are sort of now claiming, well, we couldn't have known the time of our own trades, just wasn't the case. It was very clear that they said several different things when they were asked about, well, do you know the time? Why didn't you plead that you were after those spoofs? First they said, well, the records are quite voluminous, suggesting, well, it wasn't worth our time to look through them. And then they said in some instances it wasn't available, which suggests in other instances it was. They made a conscious decision not to undertake the effort to figure out the timing of their own trades and to match them up with the timing of the spoofs in the complaint. And that is a pleading deficiency. Maybe another plaintiff more diligently would have been able to create a temporal connection. They didn't undertake that analysis. That is not something that is in some sense in the defendant's control. Well, even apart from the 30 transactions, what about the overall course of conduct that the government seems to have found about trades, bids made and then canceled and a kind of distortion of the market over a period of years? I don't really see how those details would have been available to the plaintiffs. Maybe there's something I don't know about. Well, I think two things. One is when Judge Caporni did, I think as Your Honor pointed out, when Judge Caporni did decide the silver decision, that information was before Judge Caporni because the complaint, even though it wasn't a lead part of the criminal complaint, even though it was not cited in the civil complaint, was submitted to the court between the time of when the complaint was filed and when the decision was made. But the question is what is the significance? And the allegation they have is a thousand spoofs or thousands of spoofs. And that number has to be considered in the context of the alleged wrongdoing in the markets. And when you look at that in markets where over eight years there would have been hundreds of millions of transactions, a thousand or 2,000 or 3,000 spoofs are not something that create a constant distortion of the price. And also I think the other important thing is, as this was already covered previously, but spoofing by its nature is an instantaneous action. It's premised, as Judge Caporni recognized, it's premised on efficient markets that react instantaneously. You put it in, you take it out, you make the trade, you're done. They don't put the spoof in and then trade an hour later or two hours later or do a series of trades over an hour. And they haven't, if you actually look at what, not what they argue today on appeal, but what they allege in their complaint, they don't allege that spoofing, even a thousand instances of spoofing over eight years, could have created a constant effect. But the criminal complaint alleges thousands of fraudulent orders assigned to Mr. Basis and Mr. Presilio. But the news reports and other allegations here suggest that this was a much more widespread activity in each of the three markets here. It's not just what those two traders did. Well, I respectfully disagree with that in the sense that none of the other, there are no other traders implicated in this complaint. There are other lawsuits out there involving other banks and other traders. And if those traders traded more frequently or had more information about their trades, those cases will go forward. But this case is about two employees, Mr. Basis and Mr. Presilio and their trades. So I think there are separate complaints. And maybe those have different viability. Maybe they've pled more. That's a different question. But for this case, I think we're limited to those two plaintiffs and those two traders. And as plaintiffs, you know, the fact is they have a burden of pleading their case. Just because somebody somewhere might have been injured doesn't give these plaintiffs – Judge Lynch is trying to ask a question. I know it's hard to hear with the masks on. Does the criminal complaint suggest that these two traders were always interested in spoofing in the same direction? No, Your Honor. It does not suggest. It suggests spoofing in both directions. And by the same token, the plaintiff's complaint says that there were 14 occasions where they traded in the opposite direction of the spoofers. It doesn't say, I take it, what about the other 16, whether they just didn't trade on that day or whether perhaps they traded in the same direction. I'm just wondering when we're speculating, and it seems to me largely speculation, about what the effects are in the long term of this spoofing activity. It would make a difference, wouldn't it, if in that thousands of spoofing episodes, in 500 of the thousand they spoofed the price up and in the other 500 they spoofed the price down? Yes, Your Honor. I don't believe that there's anything that says what happened on the other 16, whether they did or didn't trade on those days and whether they traded the same way. And I also agree that it matters which direction. And that's what Harry v. Total Gas does say, which is you need both elements. You need the temporal connection to a trade that says to the manipulative activity and that it was, in essence, in the wrong direction. So this is rather different than a situation like a pump and dump scheme where the whole idea is you make a big effort to raise the market in a particular security. And then you unload that security, make a big killing, and then, of course, the price collapses because you were the only person who was pushing the stock up. As I understand these kinds of markets – and again, my understanding is limited and a lot of it comes from things like the LIBOR scandal and so on. But it seems as if there are often maneuvers that traders make in terms of their short-term immediate interests that might well affect – somebody is on the other side of those trades, I suppose, and gets hurt if their scheme is successful. But then the next day they may be conspiring in the opposite direction for their own reasons. So I'm having a little trouble understanding the theory on which lots of spoofing has some long-term market impact if we don't even know whether that spoofing is consistently in one direction. Am I missing something there? Your Honor, despite your protestations, I think you actually do understand the way these markets work and the distinction between the conduct here and, say, for example, what was referred to before I think in questioning Mr. Citron of, say, a typical price-fixing conspiracy where you're a seller of widgets. You want the price of widgets up. You want them higher for the entire – as long as you can keep them higher. Or even some of the benchmarking cases have alleged a persistent unidirectional effect and others have alleged a day-to-day effect. And the cases have distinguished very carefully between those two things, one where you're trying to persistently move some rate or price one direction for an entire period – that's in your benefit – versus cases where I think the phrase often uses episodic and bidirectional. And that's what this case is. The allegations, as alleged in the criminal complaint and the plaintiffs, are episodic and bidirectional, which is contrary to the notion that there were sort of elevated or depressed prices for an eight-year period. Nonetheless, Congress in enacting the Commodities Exchange Act was trying to address, it looks to me, manipulation of market prices in a more kind of general way. Again, I, too, have no expertise in the commodities area, but it looked to me that they gave a right of action to – in a broader set of circumstances maybe than at the Securities Exchange Act where they look for manipulation, false information, other manipulation just generally. And that maybe they – as in antitrust law, they were contemplating this kind of general artificiality of the market that could be created that might cause harm, that there's a problem with – that they desire to maintain integrity of this particular type of market. And maybe they have somewhat different standards that we should apply in understanding how the market works and allowing actions to go forward. Am I misguided in that understanding? You are correct that in the Commodities Exchange Act, Congress did give a private right of action for various manipulative conduct and specifically for – or at least take for granted for this for spoofing where there was something in the lower court. Let's just assume for the moment it included spoofing. But I think there is nothing to suggest that in doing that, Congress lessened or eliminated the requirement of a private plaintiff to prove actual injury. Now, the government has taken a lot of action. The government is capable of pursuing this action. And in fact, the commodities laws are different, say, than the antitrust laws, which actually focus on this notion of a private attorney general, the idea that citizens are actually maybe helping enforce the laws. That's not in the Commodities Exchange Act. The government has said, we can regulate the commodities markets. If you were injured, you might independently be able to recover. But there is no citizen's arrest for Commodities Exchange Act. That's the government's job. The government has done it here. The government has not sat by idly. And the question becomes, if you want to bring a defendant into court, can you show, as set out in Harry v. Total Chaos, can you show that you are actually harmed by trading in the commodity? All right. Thank you very much. Thank you. Mr. Citron, you have reserved three minutes for rebuttal. So I'd like to go back to Judge Lynch's last question because I think that the upshot of that question is actually a point in our favor. You know, you asked, don't we have to kind of speculate about what the effect in the market is going to be of this episodic manipulation because sometimes it's up and sometimes it's down. And we say, yes, that's true. And that's a point in our favor on the statute of limitations question because we couldn't possibly have been aware just from the fact that there was, you know, widespread allegations of spoofing, what direction they're moving the market when, when they're manipulating it, and what they're trading. So we don't know the information we need to know in order to trigger inquiry. But what if you still don't know it now? Yes. So then there's the question of whether our allegations are sufficient for purposes of the pleading actual injury question. And two critical points on that front. If you think of that as the problem, that is a Twombly dismissal and we ought to be given leave to replete our complaint with the details that are missing. The only reason we wouldn't have made that application is because it's futile given the statute of limitations holding. So if the court disturbs the statute of limitations holding, we ought to be allowed to add the details that are missing, including looking for the information that the district court said we had, but didn't in fact have, which is the timestamps for our individual trades. So you're saying we have to decide both questions? Well, I think you, I mean, there are two independent grounds on which the district court held against us. Right. But you're saying that because at least if we agree with you on your last statement, the damages dismissal should lead to at most dismissal with leave to replete. Correct. That we still would have to address the other question because if they're right on that one, that ends the case. The statute of limitations? Yeah. Or are you saying that that one, too, you should have leave to replete? Far be it from me to make my case harder, but I think that if we can't disturb the statute of limitations ground, that we would lose. I see. I understand that position. Now let's get back to the damages thing. Suppose after all kinds of discovery, it turned out that in fact you were on one occasion harmed, but that in fact fortuitously on five occasions you were benefited because you wound up trading in the same direction at a point when they had artificially raised the price, say. Do you still get damages? So it's a good question, and my honest answer is that I don't know. I don't think that the legal rule has been settled. My understanding is that the general view is that you don't get to net out plaintiffs in this way by saying sometimes what I did was bad for them and sometimes what I did was good for them. And I get credit for the good for them part of it in defense of the bad for them part of it. Much more typically what we do is we just assess the harm caused to the plaintiff in the manipulated transactions with respect to which they're making a claim. I could see a defense of either one. Well, I mean it's just – it's a somewhat unusual situation because the more normal kinds of manipulations, it seems to me, the ones I'm more familiar with would be unidirectional. And here you have something different. It also raises – if that were to be a defense, that would also raise some interesting class action problems. Yeah, I don't think – I think it's in part for that reason that I don't think we typically do this netting for the defendant's benefit. The reconstruction of this but-for world is extraordinarily complicated. I would think so. But that, of course, is caused by the defendant's shenanigans, and we typically don't fault plaintiffs for the difficulty of that reconstruction. But can I ask a question about injury again? Yeah, sure. I mean it seems to me that what you're articulating as the basis for proceeding with the injuries pled would be sufficient for anybody who's traded in the market during this multi-year period. Is that wrong? I think that is slightly wrong. We say we traded thousands of times, too. So we're not somebody who made one transaction and is saying this transaction must have been affected. We have thousands of transactions. They have thousands of transactions. Okay. But let's say I have one transaction, and they have thousands of transactions.  It seems to me I don't have to plead as far as you would say how long spoofing's effects last. I don't have to basically allege anything other than there was spoofing, and I traded in the market. Well, I don't think you should necessarily be thrown out. I mean I think that you do in fact have a claim that is plausible given that Twombly says the plausibility standard includes things that are, quote, very remote and unlikely. Suppose we thought that was way too little in terms of likelihood. Then we get to a line drawing question, right? And then we're doing some sort of mysterious math to say that one trade in a situation with millions of transactions taking place over the period, and defendants engaging in spoofing in a thousand cases, it's just so unlikely that this one person happened to trade in that window. So how many? Five, ten, a hundred, a thousand, thousands? Where are we – what do we have to understand? And even if we did understand that – you could somehow do a statistical – again, without getting all the information, you could do some kind of statistics, a statistical test that would say the probability that you guys were affected adversely is 0.46 or something like that. Isn't that very akin to the I was hit by a taxi cab and there are only two cab companies, so it's a 0.5 chance that I was hit by the defendant? I mean isn't that again the kind of statistical pleading that we generally don't? We look for actual causation, not for – it's a good guess. Well, I mean, I think it's important, of course, that the defendants have admitted the wrong behavior. So it's not a question of like trying to figure out which cab company was driving negligently on the day. One of them has confessed to negligent driving all over the city. And then the question is, is it plausible that I was injured by that negligent cab driving? The different situation. And then on top of that, even if you think that one transaction is too unlikely, we have thousands of transactions, so it's literally thousands of times more likely that we were injured in at least one transaction, which is all that the law requires. But again, you haven't articulated how long the effects last. Isn't that critical? Well, not necessarily. If they last only two seconds, then obviously you'd have a tougher climb. Would you agree with that? Yes. I mean, I will agree. The shorter it lasts, the less likely it will become that any one of the transactions was in fact affected. And so what is in the complaint to allow us to ascertain the effects of spoofing to determine whether there's been an injury? We have our allegation that the effect lasts throughout the class period. So in the class period is how many years? I can't – So the shelf life on the spoof is years. If I spoofed this morning, it's going to have an impact like a butterfly's wings for years. That's not what we're saying. They're engaged in pervasive spoofing throughout the class period. They've admitted that. What we're saying is that pervasive spoofing is enough to make the prices artificial throughout the class period. But you can disagree with that. I mean, we're going to have a factual fight about that. No expert has testified about it. We haven't developed – we're in the middle of developing a model for it. But we were at just the pleading stage. But even if you disagree with that, we have shown that we were trading in the opposite direction of them on the exact same day, on 14 of a random sample of 30 days. And we don't know if we were right after them or before them. We don't know the answer to that question because we didn't look for it. The district court assumed that we had that information in hand. That's factually incorrect. All of it is not appropriate for the pleading stage. And if we think that that information is critical, if your view is, look, I just can't let you go forward unless you get that information about when your time stamp is, we could go get it. You know, we're entitled to replead if the problem is a Twombly problem, if it's about the plausibility of our allegation. But we can't get repleading until we disturb the statute of limitations holding, which I think is clearly incorrect for all the reasons we've been given. Thank you very much. Thank you. If your argument is well argued, we'll reserve decision.